[No. 18829. Department One. March 12, 1925.]

*In the Matter of the Estate of* GEORGE WASHINGTON
CARMACK, *Deceased.*

HERMON S. FRYE, *as Administrator etc., et al.,
Respondents,* v. MARGUERITE CARMACK,
*Appellant.*[1]

APPEAL (418)—REVIEW FINDINGS. Findings of the trial court
discrediting an improbable story of a witness, after having the
advantage of seeing and hearing her on the witness stand, will not
be disturbed on appeal.

HUSBAND AND WIFE (18)—SEPARATE PROPERTY OF WIFE—DEED FROM
HUSBAND. Separate real estate of the husband, deeded by him to
the wife becomes her separate property, there being no creditors,
unless the testimony is very clear and convincing that such was not
the intention.

SAME (51, 56)—COMMUNITY PROPERTY—CONFUSION OF SEPARATE
AND COMMUNITY FUNDS. Although real property of the husband
deeded to the wife, became her separate property, yet where it was
sold and the proceeds given largely to the husband to deal with as
he saw fit, and he thereafter confused and commingled it with
community funds so as to make it impossible to trace it, the prop-
erty thereafter acquired became vested in and belonged to the com-
munity.

SAME (56-1)—COMMUNITY PROPERTY—SEPARATE PROPERTY OF WIFE
—IMPROVEMENTS ON SEPARATE PROPERTY — COMMUNITY OR SEPARATE
FUNDS. Where the husband's separate real property of little value
was deeded by him to the wife and became her separate property,
but thereafter the community made extensive improvements thereon,
paid the taxes and managed the same as community property, the
separate interest of the wife is limited to the value of the lot with-
out the improvements, which belong to the community.

SAME (99)—COMMUNITY PROPERTY—ADMINISTRATION — PROPERTY
SUBJECT. Where it is impossible to physically segregate the wife's
separate interest in real estate which was improved by the com-
munity, the lot and improvements are subject to administration with
the other separate and community property of the deceased husband.

SAME (99). Where part of the purchase price of property was
either the husband's separate property or funds of the community, it
is subject to administration as estate of the deceased husband.

[1]Reported in 233 Pac. 942.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered January 19, 1924, upon findings in favor of the plaintiffs, after a hearing before the court upon objections to the final report of an administrator. Modified.

*C. H. Steffen* and *Andrew J. Balliet,* for appellant.
*Frank E. Hammond,* for respondent.

BRIDGES, J.—This case involves the story of the life of George Washington Carmack, the discoverer of the Klondike. He died in June, 1922. Marguerite Carmack, claiming to be his widow, applied to the courts of this state for administration on his estate. She was appointed, took the oath of office, and gave bond and proceeded to the performance of her duties. Within a few weeks, Rose Curtis, claiming to be the sister of the deceased, and Grace Saftig, claiming to be his daughter by a former marriage, petitioned the court to remove the administratrix for various reasons, among others, that she was not a resident of the state of Washington. Upon this matter coming on to be heard, Mrs. Carmack admitted that she was not a resident of the state and expressed a willingness to resign and asked that a designated person be appointed. The court removed her and appointed as administrator with the will annexed, Hermon S. Frye, a person of his own selection.

Thereafter Mrs. Carmack, as administratrix, filed a final report, claiming that she was entitled to be allowed $697.22 for moneys paid out, and claiming that the only property in which the deceased was interested which had come into her hands was a small amount of personal property and lots 5 and 8 and the east ½ of the N. E. ¼ of sec. 18, township 22, R. 11, E., in the state of Washington. Mrs. Saftig, Rose Curtis and the second administrator filed exceptions to the report

and claimed that a large amount of real and personal property in which the deceased was interested at the time of his death had come into the hands of Mrs. Carmack and had not been inventoried nor accounted for by her. Thereupon a citation was issued by the court, requiring Mrs. Carmack to appear and answer touching any property in her hands belonging to the estate. At this hearing a great deal of testimony was taken and the court ultimately entered a judgment finding that a large amount of additional property, particularly real estate of very considerable value, had come into the hands of Mrs. Carmack as administratrix, which property was either the separate property of the deceased or the community property of the deceased and Mrs. Carmack. The latter has appealed.

We abstract the following facts from the findings of the trial court: The deceased had long been a wanderer and a man of the world; he had prospected for precious metals throughout the United States; he finally drifted into the Dominion of Canada and to the Yukon district and there resided with a small tribe of Indians. In 1887, he and Kate Mason, one of the tribe, met, and thereafter for a number of years lived together as man and wife. Ultimately he discovered those gold pockets in the Klondike region which fired the spirit of the country and drew thither thousands of people. In 1898, he came to Seattle and California, bringing with him the Indian woman, who by that time was generally known as Mrs. Carmack, and her daughter, Grace, more commonly known as Graphie. He lived with them for a short while in California and then left them with his sister and returned to the Klondike. On his way north he stopped in Seattle and bought some real property. Early in 1900, he met the present Mrs. Carmack. She also had been a wanderer and had traveled in various parts of the world, and the dis-

covery of gold in the Yukon attracted her thither. Within a few months after the meeting of these two persons, they came south on the same boat, stopped at Seattle for two or three days, and then continued to San Francisco. While there Carmack informed his so-called first wife that he would no longer live with her. Shortly thereafter he and the present Mrs. Carmack came north and were married in the city of Olympia in 1900. They lived together in Seattle thenceforward, accumulating a good deal of property and transacting much business.

The question to be determined here is an exceedingly narrow one. We are not interested in whether the first Mrs. Carmack was the lawful wife of the deceased, nor whether the second wife was lawfully married to him, nor whether Graphie Saftig is his lawful daughter. These are matters which may be determined in subsequent litigation, but which the trial court correctly refused to adjudicate in this action. The only question involved here is, what property did the deceased own as his separate property and what property did he and Mrs. Carmack own as community property, at the time of his death. His separate and the community property must, of course, be administered.

The appellant claims that practically all of the property belonged to her and that Mr. Carmack had almost nothing at the time of his death. She testified that at no time after she met him did he have in excess of $30,000, and that he soon lost this in various mining and business enterprises; that, during the nearly two years she was in Dawson, she operated a cigar store and made about $60,000, and that at all times she kept the money or gold dust in her possession and did not do any banking; that she brought all of her money with her on her person when in the year 1900 she came to the states. Concerning her testimony in this and other

respects, the trial court said: ''The court gives no credence to this story. The many contradictions in her testimony, her apparent effort to conceal the facts, her reluctance to testify, her suppression of evidence, her demeanor upon the witness stand and the improbability of her testimony, all convince the court of its incredibility, and being uncorroborated, the court discards it as unworthy of belief.'' When we consider the unusualness of the facts to which she testified and that the trial court had the advantage of seeing and hearing her on the witness stand, we are not disposed to, nor will we, differ with the trial court in his findings concerning her credibility.

There is not much controversy over the findings of the trial court with reference to the personal property in the hands of Mrs. Carmack and belonging to the deceased, and since it is of comparatively small value, we will say nothing more than that we heartily concur in that respect with the judgment of the trial court.

But the court found that there were five or six pieces of real estate, some of considerable value, which were either the separate property of the deceased or the community property of himself and Mrs. Carmack, and which had not been accounted for by her as administratrix, and directed that she surrender all such property into the possession of the administrator with the will annexed. The court also found that, after the death of Mr. Carmack, she had collected considerable sums of money in the way of rent from different real estate and that she should also account for that to the administrator.

To review the testimony in detail concerning these various properties would be to carry this opinion beyond a reasonable length. It would appear that, after the marriage of the deceased and Mrs. Carmack, business and property matters were handled in common.

They had one common box in a safety deposit vault, and for the most part they kept one common account at the bank and each had a right to draw thereupon. Deceased took gold of much value from his mine. Most of this was obtained before his marriage to the present Mrs. Carmack. We think the testimony fairly shows that one time or another he brought between $50,000 and $100,000 from the Yukon.

Of all the real estate involved we will particularly discuss only the south ½ of lot 7, block 3, Maynard's Plat, located in Seattle, commonly known as the Comet property, and lot 7, block 42, Maynard's Plat, commonly known as the Togo property. These two properties were acquired by the deceased prior to his marriage with Mrs. Carmack. As to the Comet, its history is as follows: it was bought by deceased in 1899 and $30,000 was paid therefor. In June, 1901, about a year after the marriage, Mr. Carmack deeded the property to Mrs. Carmack and the deed expressed a consideration of $5 and love and affection, but the revenue stamps thereon indicate a greater monetary value. Thereafter the property appears to have been mortgaged, Mr. and Mrs. Carmack joining therein. Apparently the money thus raised was used for community purposes. In October, 1909, the deceased and his wife deeded the property to Dugan-Ferguson Investment Company, receiving therefor $57,733.10 net. According to the testimony of Mrs. Carmack, most, if not all, of this money was given to Mr. Carmack.

Whatever may have been the character of this property in the first place, we have no doubt it became Mrs. Carmack's separate property when in June, 1901, she received a deed therefor from Mr. Carmack. She testified that she paid him $30,000 for the deed. The trial court did not believe this, but it is not necessary to consider that question. Mr. Carmack had a right,

as against everybody except creditors (and they are not involved here), to make his wife a gift of his interest in the property. We have held that, where a husband deeds his separate property or his interest in community property to his wife, the full title is vested in the wife as her separate property, unless the testimony is very clear and convincing that such was not the intention. *Goodfellow v. Le May,* 15 Wash. 684, 47 Pac. 25; *Stewart v. Kleinschmidt,* 51 Wash. 90, 97 Pac. 1105; *Christopher v. Ferris,* 55 Wash. 534, 104 Pac. 818. It is true that there are some things to indicate that by vesting the title to this property in Mrs. Carmack it was not the intention that it should thereby become her separate property. It appears quite clearly that, after the making of this deed, the property was handled as it was before, and when it was sold the purchase price was turned over to Mr. Carmack, apparently to use in any way he saw fit; but this conduct is not entirely antagonistic to the idea that the property became her separate property, and we think it must be held that, up to the time it was sold, it was her separate property. But all of the money was turned over to Mr. Carmack and thereafter it is impossible to trace it in its separate character. It was swallowed up in the general community business transactions. In *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414, we said:

"Its separate and community natures have become so confused that the court cannot apportion them, and the favor with which community property is regarded and the presumptions in favor of it are such that we must agree with the trial court that these funds in bank are the property of the community. . . ."

So we have held that, where separate funds have been so commingled with the community funds as to make it impossible to trace the former or tell which

are separate and which are community funds, all funds or property into which they have been invested belong to the community. *Yesler v. Hochstettler,* 4 Wash. 349, 30 Pac. 398; *Doyle v. Langdon,* 80 Wash. 175, 141 Pac. 352; *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129. Such is the situation here and we hold that the money and the property into which it was vested belonged to the community.

As to the Togo property, the following is its history: It was bought by the deceased in September, 1898, two years before his marriage to Mrs. Carmack. He paid $2,500 for it; the improvements were almost valueless. At the same time Mr. Carmack deeded the Comet property to Mrs. Carmack he also deeded to her the Togo property, and thereafter a large building was constructed on this lot, and the trial court found that the property is now worth about $50,000. He also found, and we think correctly, that these improvements were made with either the separate funds of Mr. Carmack or with community funds; that it was mortgaged, each member of the community executing the note and mortgage, that it was managed by Mr. Carmack as community property, and that all taxes, assessments, repairs and general charges were paid either from his separate funds or from the community funds. The trial court found that this was either the separate property of Mr. Carmack or the property of the community. The deed given by him to her in 1901 had the effect of making this property hers whether she paid him anything for it or received it as a gift. But the community money and efforts greatly increased its value.

This situation would unquestionably give the community a large interest in, but not the entire ownership of, the property, because there can be a segregation of the community interest from the separate inter-

est of Mrs. Carmack. The bare lot was hers, the improvements thereon belonged to the community. There is no testimony to show the value of the lot without the improvements. This testimony can, of course, be easily obtained. Assume that the bare lot would be worth at this time $10,000 and the lot and improvement worth $50,000, then Mrs. Carmack would have a separate interest in the property to the extent of $\frac{1}{5}$ of its total value and the community would have a $\frac{4}{5}$ interest. We therefore hold that Mrs. Carmack had an interest in this property which is her separate property, yet much the larger interest belongs to the community. It is impossible, of course, to physically segregate the separate from the community interest. It is therefore necessary that the whole of it be put into the hands of the administrator for administration. It is probable that the administrator should ultimately be required to account to Mrs. Carmack according to her separate interest.

The remainder of the property involved was acquired after marriage. It is impossible to tell the exact source of the money which purchased it. Plainly, however, a part of the purchase price is represented by the proceeds of the sale of the Comet, a part by the rents, issues and profits of the Togo, a part, in all likelihood, from the separate funds of Mr. Carmack, and a part by the joint efforts of Mr. Carmack and his wife. There is no testimony segregating these contributions. This situation requires us to hold that the property which was obtained after the marriage was either the separate property of Mr. Carmack or community property of himself and his wife. It is not necessary that we should determine which it is, because, whether it is one or the other, it must go into the possession of the administrator, and that is the only matter we have before us in this proceeding.

Appellant complains that a certain deposition made by the deceased was read in evidence in this case. It appears that prior to February, 1901, the first Mrs. Carmack had instituted a suit against the deceased for divorce, or possibly separate maintenance, and that this deposition was taken as a part of the testimony in that case. We will not decide whether the court erred in receiving this testimony. It was almost exclusively concerning Mr. Carmack's relationship with Kate Carmack and her daughter, the present Graphie Saftig, and whether the latter was his daughter. These questions are wholly immaterial to this action and if the deposition be entirely eliminated the result will not be changed.

The trial court made certain findings that the deceased and Kate Carmack lived together as husband and wife and that a child, Graphie, was born to them, and that the deceased had acknowledged his paternity of this child. These and like questions are not involved in this case, and those findings should be taken as preliminary recitals rather than as findings or adjudications. We here simply hold that, as between the present Mrs. Carmack and the administrator, the property involved is either the separate property of deceased or the community property of himself and Mrs. Carmack (except the separate interest of the appellant in the Togo property), and consequently should be administered by the present administrator. The determination of all other questions must be made in other actions.

The judgment as modified (if such modification be necessary) is affirmed. Costs will be awarded against the appellant.

TOLMAN, C. J., MAIN, ASKREN, and PARKER, JJ., concur.